UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| THOMAS A. KUEMMEL, JR., | |
| Plaintiff, | |
| v. | CAUSE NO.: 1:20-CV-239-TLS |
| KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, | |
| Defendant. | |

**OPINION AND ORDER**

The Plaintiff Thomas A. Kuemmel, Jr. seeks review of the final decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits and supplemental security income. The Plaintiff argues that the Administrative Law Judge (ALJ) failed to properly consider the treating physician's opinion, failed to include all of his limitations in the physical RFC, erred in assessing his mental impairments and limitations, and erred in relying on the VE's testimony. For the reasons set forth below, the Court finds that reversal and remand for further proceedings is required.

**PROCEDURAL BACKGROUND**

The Plaintiff has filed multiple applications for disability insurance benefits and supplemental security income, with the first set of applications filed on September 24, 2010, alleging disability beginning on July 20, 2010. AR 1146, ECF No. 21. A second set of applications were filed on August 29, 2013, and September 3, 2013, alleging disability beginning on May 1, 2012. AR 1477, 1484. The third set of applications were filed on March 25, 2017, alleging disability beginning on September 2, 2015. AR 62. All three sets of applications were

denied initially and on reconsideration, and an ALJ issued unfavorable decisions after a hearing. AR 128, 1079, 1143.

The Plaintiff appealed the 2013 filings to the District Court prior to the March 25, 2017, applications. AR 3, 128. Pursuant to a District Court remand order on March 5, 2018, the Appeals Council directed the ALJ to support the credibility analysis with substantial evidence. AR 3–4, 139. On October 29, 2018, an ALJ issued an unfavorable hearing decision on the March 25, 2017, applications. AR 3. Due to the prior and subsequent applications involving claims for supplemental security income under Title XVI with overlapping periods at issue, the Appeals Council found that the applications should be consolidated and adjudicated in a new hearing. AR 3–4. The Appeals Council also vacated the hearing decisions dated September 1, 2015, and October 29, 2018, and ordered the ALJ to consolidate the claims files and issue a new decision on the consolidated claims. AR 4, 1082.

A new hearing was held on January 7, 2020, where the Plaintiff confirmed that he is alleging disability beginning July 20, 2010. AR 19–20, 1082. The ALJ issued an unfavorable decision on March 2, 2020. AR 1079. The Plaintiff did not seek review of the ALJ's decision by the Appeals Council, and the Appeals Council did not review the decision on its own; therefore, the ALJ's decision became the final decision of the Commissioner on the sixty-first day following the date of the decision. AR 1080. The Plaintiff now seeks judicial review under 42 U.S.C. § 405(g). On June 25, 2020, the Plaintiff filed his Complaint [ECF No. 1] in this Court, seeking reversal of the Commissioner's final decision. The Plaintiff filed an opening brief, the Commissioner filed a response brief, and the Plaintiff filed a reply brief. ECF Nos. 28–30.

**THE ALJ'S DECISION**

For purposes of disability insurance benefits and supplemental security income, a claimant is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).[1] To be found disabled, a claimant must have a severe physical or mental impairment that prevents him from doing not only his previous work, but also any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). An ALJ conducts a five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520.

The first step is to determine whether the claimant is no longer engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i), (b). In this case, the ALJ found that the Plaintiff engaged in substantial gainful activity from July 20, 2010, the application date, through November 2010, but that the Plaintiff has not engaged in substantial gainful activity since November 2010. AR 1085.

At step two, the ALJ determines whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii), (c). Here, the ALJ determined that the Plaintiff has the severe impairments of degenerative disc disease, status post-surgical intervention in 2001 and 2010; degenerative joint disease of the left knee; obesity; depression; and anxiety. AR 1085.

Step three requires the ALJ to consider whether the claimant's impairment(s) "meets or equals one of [the] listings [in appendix 1 to subpart P of part 404 of this chapter]." 20 C.F.R.

---

[1] The Court cites the disability insurance benefits statutes and regulations, which are largely identical to those applicable to supplemental security income. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

§ 404.1520(a)(4)(iii). If a claimant's impairment(s), considered singly or in combination with other impairments, meets or equals a listed impairment, the claimant will be found disabled without considering age, education, and work experience. *Id*. § 404.1520(a)(4)(iii), (d). Here, the ALJ found that the Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listing, indicating that she considered Listings 1.02, 1.03, 1.04, 12.04, and 12.06 and SSR 19-2p. AR 1086–87.

When a claimant's impairment(s) does not meet or equal a listing, the ALJ determines the claimant's "residual functional capacity" (RFC), which "is an administrative assessment of what work-related activities an individual can perform despite [the individual's] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1520(e). In this case, the ALJ assessed the following RFC:

> After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except can occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl; can never climb ladders, ropes, or scaffolds. Can frequently handle and finger bilaterally. Needs a cane to ambulate more than 50 feet; and is able to balance commensurate with the limitations outlined in this Residual Functional Capacity. Work with an option to sit or stand, changing positions no more frequently than every 30 minutes, while remaining on task. With work that can be learned in 30 days, or less, with simple routine tasks; work with daily or weekly productivity goals, that is not hourly productivity goals. With occasional interaction with coworkers and supervisors, and no interaction with the general public.

AR 1089–90.

The ALJ then moves to step four and determines whether the claimant can do his past relevant work in light of the RFC. 20 C.F.R. § 404.1520(a)(4)(iv), (f). In this case, the ALJ found that the Plaintiff is unable to perform his past relevant work as a resin operator, CNC operator, key seating machine operator, fiberglass body repair, or material handler. AR 1096.

4

If the claimant is unable to perform past relevant work, the ALJ considers at step five whether the claimant can "make an adjustment to other work" given the RFC and the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v), (g). Here, the ALJ found that the Plaintiff is not disabled because the Plaintiff can perform significant jobs in the national economy of document preparer, address clerk, and inspector. AR 1097. The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1512.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the agency's final decision. 42 U.S.C. § 405(g). On review, a court considers whether the ALJ applied the correct legal standard and whether the decision is supported by substantial evidence. *See Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). A court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

The court considers the entire administrative record but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [the court's] own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Nevertheless, the court conducts a

"critical review of the evidence," and "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (citations omitted); *see also Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014) ("A decision that lacks adequate discussion of the issues will be remanded."). The ALJ is not required to address every piece of evidence or testimony presented, but the ALJ "has a basic obligation to develop a full and fair record and must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (internal citations omitted). However, "if the Commissioner commits an error of law," remand is warranted "without regard to the volume of evidence in support of the factual findings." *White ex rel. Smith v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

## ANALYSIS

In this appeal, the Plaintiff raises multiple arguments, but the Court need only address one that compels remand. The ALJ erred in cherry picking and mischaracterizing evidence in the decision. This error impacted several portions of the decision, including the paragraph B analysis and the RFC determination. The ALJ's repeated cherry picking and mischaracterization of evidence throughout the decision compels remand.

The RFC (residual functional capacity) is a measure of what an individual can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); 20 C.F.R. § 404.1545(a)(1). The "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The relevant evidence of the

6

individual's ability to do work-related activities includes medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. SSR 96-8p, 1996 WL 374184, at *5. The determination of a claimant's RFC is a legal decision rather than a medical one. *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)). In analyzing the evidence to determine the RFC, the ALJ may not "cherry-pick from . . . mixed result to support a denial of benefits." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

The Plaintiff asserts that the ALJ erred in supporting the RFC analysis by repeatedly relying on his ability to care for his daughter, the lack of suicide attempts, his failure to seek outpatient psychiatric care, and his ability to occasionally stretch his part time job at Kroger to a 40-hour work week.

In discussing the paragraph B criteria, the ALJ found that the Plaintiff has a moderate limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing oneself. AR 1087–89. The ALJ noted that despite claiming to be easily irritated, the Plaintiff "took care of his three-year-old daughter while [his] wife worked during the day." AR 1088–89. The ALJ used this to discount Plaintiff's testimony and allegations regarding his ability to interact with others and to manage himself. *Id.* The ALJ also relied on his working "up to 40 hours per week at a grocery store" to find that he was not as

7

limited in interacting with others; concentrating, persisting, or maintaining pace; or managing himself as he alleged. *Id.*

In discussing the paragraph C criteria, the ALJ indicated that despite reporting suicidal thoughts, the Plaintiff did not have any attempts during the relevant period. AR 1089. The ALJ also again relied on his ability to watch his daughter while his wife worked. *Id.* The ALJ then noted that the Plaintiff did not require emergency or inpatient care for his mental impairments, even when he shot himself to "get [his] knee fixed." *Id.* The ALJ then found that the Plaintiff failed to seek outpatient psychiatric care despite being advised to do so multiple times, and that he instead occasionally took his wife's medication when he had a "bad day." *Id.*

The ALJ's analysis of the Plaintiff's mental impairments includes multiple instances of cherry picking and mischaracterizations of the medical evidence. The ALJ mentions six times throughout the decision that the Plaintiff was capable of working "up to 40 hours a week." AR 1089–96. The ALJ used this statement to contradict the Plaintiff's physical symptoms, mental symptoms, and medical opinion evidence. *Id.* However, the Plaintiff testified that he usually worked 5- or 6-hour days at Kroger and that he only worked 36 to 40 hours a week occasionally, if multiple people were on vacation. AR 33. He also testified that working the extended hours took a toll on his body, and he would have to take days off following a week of working that many hours. *Id.* In describing the Plaintiff's subjective complaints, the ALJ noted that he worked 36 to 40 hours a week when other people were on vacation and that it caused him to "miss a week of work afterwards." AR 1091. The ALJ also acknowledged that the Plaintiff regularly worked 25 to 30 hours a week at Kroger in discussing the vocational expert's testimony, but the number of hours he regularly worked is absent from the RFC analysis. The ALJ seems to imply that the Plaintiff could have worked 40-hour work weeks consistently, as the ALJ noted that the

8

Plaintiff "reported having worked up to 40 hours per week at a grocery store, despite his testimony of working less hours per week." AR 1088. There is no evidence in the record to support this assertion, as the Plaintiff stated that the longer work weeks were exceedingly difficult for him, that the extended hours led to him taking an entire week off of work, and that he regularly only worked 25 to 30 hours per week. AR 33, 1088, 1091.

  The ALJ did not provide any discussion of his struggles to maintain a 40-hour work week in the analysis, and the ALJ fails to acknowledge the rarity of his 40-hour work weeks. Instead, the ALJ repeatedly stated that the Plaintiff is capable of working up to 40 hours a week, implying that he is capable of regularly working 40 hours a week. This is not consistent with the medical evidence, which shows that the Plaintiff did not regularly work 40 hours a week and, when he did, he missed multiple workdays as a result. The ALJ has failed to build a logical bridge from the evidence to the conclusion that the Plaintiff could regularly work a 40-hour workweek, and this error requires remand. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

  The ALJ also improperly relied on the Plaintiff's ability to care for his three-year-old daughter in determining his physical and mental RFC. The ALJ found that the Plaintiff was able to care for his three-year-old daughter "all-day" while his wife was at work. AR 1088, 1094. The Plaintiff responds by asserting that his wife only worked part time and, therefore, he was not watching his daughter "all day" as alleged. There is no evidence in the medical record to indicate how often or for how long his wife was gone at work during the week during the relevant time period outside of a single sentence in the consultative examination. However, there are other issues with the ALJ's analysis. The ALJ failed to consider the level at which the Plaintiff cared for his daughter or whether he was caring for his daughter continuously during the relevant time period. At the 2013 hearing, the Plaintiff stated that he fed his then two-year-old daughter a

9

breakfast of cereal, and that he could lift her up and put her to the side while she was at 25 pounds. AR 1333-34. At the 2015 hearing, the Plaintiff reported that his daughter had just started preschool, and that he occasionally picked her up from the school. AR 1381–82. He stated that his caring for her included playing board games like Candy Land and he occasionally fed her dinner, like a sandwich. AR 1381, 1386–87. At the 2018 hearing, the Plaintiff stated that both of his children were in school, and he was no longer caring for his daughter all day. AR 103.

The ALJ appears to be relying on an October 2013 consultative examination, wherein the Plaintiff reported that he was taking care of his 3-year-old daughter while his wife worked, usually for about nine hours, but that he had only been doing this for two weeks. AR 1654. There is no evidence of how long this arrangement lasted or whether it continued past this point in time. The Plaintiff stated that he did feed his daughter, but it was usually sandwiches or cereal. *Id.* He also stated that they stayed home all day watching television and that he struggled to get himself to play with her because he feared hurting himself. *Id.* The ALJ did not provide any information as to how the Plaintiff cared for his daughter. There is no evidence that the Plaintiff's ability to care for his young daughter was equal to working a full-time job. Furthermore, the consultative examiner stated that the Plaintiff needed support from others to accomplish his daily tasks and that his ability to sustain those tasks on a daily basis appeared to be impaired. *Id.* The ALJ cherry picked the single sentence regarding the Plaintiff taking care of his 3-year-old daughter for nine hours without considering the evidence that indicated how limited the Plaintiff was in his ability to care for her.

In *Gentle v. Barnhart*, the Seventh Circuit found that remand was appropriate where an ALJ relied on a claimant's ability to care for her children yet failed to understand that she struggled to do so and required the aid of others. 430 F.3d 865, 867 (7th Cir. 2005) ("Gentle *must*

10

take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts."). The Seventh Circuit has continued to "urge[] caution in equating [daily activities] with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member." *Beardsley*, 758 F.3d at 838 (citations omitted). This is not to say that the ALJ cannot take a claimant's daily activities or ability to care for children into account, but rather, the ALJ must also consider how the claimant completes the activities and any limitations or struggles the claimant has in completing the activities. *See Craft*, 539 F.3d at 680; *Zurawski*, 245 F.3d at 887. The ALJ failed to do so here, and, therefore, remand is appropriate.

      The ALJ also erred in dismissing the Plaintiff's suicidal thoughts by finding he had not had any suicide attempts during the relevant period. The ALJ pointed to the Plaintiff's lack of suicide attempts six times throughout the decision to discredit the indication in the medical record that he was suffering from suicidal thoughts. AR 1088–89, 1091, 1093. The ALJ failed to explain how thoughts of self-harm and suicide can be discredited or found to be less limiting due to a lack of suicide attempts. This defies common sense. The medical record indicates that the Plaintiff has presented with thoughts of suicide or self-harm throughout the relevant time period. In a consultative examination in 2013, the Plaintiff presented with suicidal thoughts. AR 1650. Multiple treatment notes between 2013 and 2017 indicate he had thoughts of suicide or self-harm. AR 443, 457, 514, 1674, 1717, 1903. It is unclear why the ALJ believed that regular consistent thoughts of suicide or self-harm over at least four years is somehow discredited by a lack of suicide attempts.

      More importantly, the ALJ completely ignores the medical notes from the Plaintiff's 2015 hospitalization for shooting himself in the knee. The ALJ found that "even when he shot

11

himself . . . treatment notes indicate he did not need inpatient psychiatric care." AR 1089, 1094. Later in the decision, the ALJ noted that he denied suicidal ideation and was "purportedly upset he had missed his target." AR 1093. The ALJ glossed over most of the treatment notes and mischaracterizes this evidence. The ALJ seems to be taking all of this information from his discharge note, which indicated that the Plaintiff was deemed high risk for self-harm but was not currently suicidal and therefore could be discharged. AR 1872. The discharge note also indicated that he needed outpatient psychiatric care and had an appointment scheduled for later that day. *Id.* However, the discharge note does not explain what happened throughout the course of the Plaintiff's stay in the hospital. During his stay, at times the Plaintiff would not answer as to whether he was suicidal, and the notes specifically indicate he did not deny being suicidal. AR 1888, 1902. The Plaintiff stated he was depressed all of the time, and the hospital labeled him high risk for suicide due to having access and means with a gun in the home. It was recommended that he be put in inpatient psychiatric care for further evaluation. *Id.* That day, the hospital filled out an application for emergency detention, which was authorized by a judge that afternoon. AR 1876–77. The Plaintiff was then put on a 72-hour hold, and plans were made to discharge him to inpatient psychiatric care after the 72-hour hold. AR 1927. The doctor stated that the Plaintiff "clearly [had] mental health issues related to shooting [himself] in the knee." *Id*. The doctor also noted that while he had a relatively normal affect, his mood "appears to change quickly from irritable to slightly friendly and humorous," and that "he will need to have some kind of psychiatric evaluation." AR 1929. The following day, the Plaintiff was admitted to the intensive care unit with suicide precautions. AR 1958. This treatment note indicated that he denied suicidal ideations but that he was upset he missed his target. AR 1960. In preparing for discharge, the hospital set up an outpatient psychiatric care appointment for the Plaintiff and

noted that his behavior was "anxious." AR 2024. The doctor specifically noted that although the Plaintiff was not currently suicidal, "he could be at risk in the future if he does not address his ongoing issues." AR 2034.

The ALJ improperly found that the Plaintiff did not require inpatient psychiatric care after shooting himself in the knee. The Plaintiff was held for 72 hours in inpatient care due to a court order finding him to possibly be "mentally ill and dangerous," and at least some of that time was spent in an intensive care unit on suicide precautions due to continued concern for his safety. AR 1876–77, 1958. While the Plaintiff was ultimately not released to long-term inpatient psychiatric care, he still received inpatient psychiatric care, and his care was escalated to intensive care during his stay due to concerns for his safety. The ALJ failed to acknowledge this in the decision and seems to gloss over the fact that he shot himself by finding that there was no lasting damage to his knee. AR 1093–94. Common sense would dictate that if the Plaintiff shot himself in the knee, either his pain truly was bad enough to warrant him justifying shooting himself in the knee, or his mental impairments led to self-harm. The ALJ did not come to this conclusion, despite a doctor telling plaintiff that "it is not normal for people to shoot themselves in the knee even if they are having a lot of pain." AR 1929. The ALJ mischaracterized the Plaintiff's hospital stay and failed to properly discuss and analyze the Plaintiff's mental impairments and how they affected his self-harm in shooting himself in the knee.

The ALJ also improperly relied on the Plaintiff's failure to seek outpatient treatment despite advice from medical professionals. AR 1094. The ALJ found that even when he did seek psychiatric care, he only attended for a few months due to his therapist leaving the practice. *Id.* The ALJ noted that the record does not show that he found a new therapist, despite the Plaintiff's claims that he would do so. *Id.* This finding is improper for multiple reasons. As an initial matter,

the ALJ fails to consider why the Plaintiff may not have sought further care. In 2013, the Plaintiff noted that he did not have insurance, and therefore could only receive treatment from his primary care physician. AR 1650. The ALJ mentions the Plaintiff's lack of insurance once in the decision, but found that this was immaterial because "[h]e did not appear to seek out financial assistance for his medications or to ask for reduced cost or free mental health treatment." AR 1093.

The Seventh Circuit has cautioned ALJs on using a failure to seek treatment as a primary reason to discredit a claimant's reports of mental impairment symptoms and limitations. *See Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) ("[M]ental illness . . . may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment."). The ALJ has, at a minimum, a duty to consider any possible explanations for noncompliance, such as lack of insurance, financial hardship, or mental impairment struggles, before relying on noncompliance to find that a claimant is less limited than alleged. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (collecting cases); *see also Kangail*, 454 F.3d at 630–31. The ALJ failed to sufficiently do so here. There is evidence that, at various times throughout the relevant time period, the Plaintiff had financial concerns or lacked insurance. AR 1340, 1650.

The ALJ failed to properly consider the Plaintiff's financial limitations and instead stated that the Plaintiff could have taken advantage of financial assistance or free mental health treatment. AR 1093. However, there is no evidence in the record that financial assistance or free mental health treatment was available to the Plaintiff. Even if assistance had been available, there is no evidence that the Plaintiff was aware of any such assistance. The ALJ failed to consider that such assistance might not have been available or known to the Plaintiff. As such, the ALJ failed to properly consider the Plaintiff's reasons for not seeking treatment outside of his general

14

practitioner for his mental impairments. *Lockwood v. Colvin*, No. 15 C 192, 2016 WL 2622325, at *8-9 (N.D. Ill. May 9, 2016) ("[R]egarding Plaintiff's failure to seek the free or reduced-cost treatment available to him, the ALJ did not consider the fact that Plaintiff was unaware that such treatment options existed.").

## CONCLUSION

For the reasons stated above, the Court hereby GRANTS the relief sought in the Plaintiff's Brief [ECF No. 28] and REVERSES the decision of the Commissioner. The Court REMANDS this matter for further proceedings consistent with this Opinion.

SO ORDERED on March 24, 2023.

s/ Theresa L. Springmann  
JUDGE THERESA L. SPRINGMANN  
UNITED STATES DISTRICT COURT